1

2

3

4

5

6                        UNITED STATES DISTRICT COURT
                        WESTERN DISTRICT OF WASHINGTON
7                                  AT SEATTLE

8   MacNEIL AUTOMOTIVE PRODUCTS
    LIMITED d/b/a WEATHERTECH; and
9   MacNEIL IP LLC,

10                      Plaintiffs,

11        v.                                        C20-0278 TSZ

12   YITA, LLC d/b/a Oedro or YitaMotor;            ORDER
    and JINRONG (SH) AUTOMOTIVE
13   ACCESSORY DEVELOPMENT CO.,
    LTD.,
14
                        Defendants.
15

16        THIS MATTER comes before the Court on cross-motions for summary judgment,

17   docket nos. 225 and 234.  Having reviewed all papers filed in support of, and in

18   opposition to, the motions, and having concluded that oral argument would not be

19   beneficial, the Court enters the following Order.

20   **Background**

21        This case has a long and tortured procedural history, and the parties, which are

22   competitors in the vehicle floor tray market, have been litigating in various forums for

23

ORDER - 1

several years.[1]  Now on the verge of trial, they ask the Court to enter summary judgment

in favor of one or the other side.  The Court declines to do so because the factual issues

involved must be decided by a jury.  Those issues include (i) whether the unregistered

trade dress defendants allegedly imitated is functional de jure[2] and therefore not subject

to protection under the Lanham Act; (ii) if not functional de jure, whether the trade dress

has acquired secondary meaning[3]; (iii) if the trade dress has secondary meaning, whether

---

[1] The two consolidated cases before the Court began in April 2019 in the Northern District of Illinois.  *See* Order at 2 (docket no. 129).  Since then, the parties have appeared in inter partes review proceedings before the United States Patent and Trademark Office ("PTO") Patent Trial and Appeal Board ("PTAB"), as well as the United States Court of Appeals for the Federal Circuit; plaintiffs' claims relating to U.S. Patents Nos. 8,889,655 and 9,138,917 are currently stayed pending the Federal Circuit's review of the PTAB's decisions concerning those patents. *See* Minute Order at ¶ 1 (docket no. 182).  Plaintiffs' claim of infringement as to U.S. Patent No. 8,382,186 has been dismissed in light of the Federal Circuit's invalidation of all claims of the patent.  *See* Minute Order at ¶ 1 (docket no. 172) (citing *Yita LLC v. MacNeil IP LLC*, 69 F.4th 1356 (Fed. Cir.), *cert. denied*, 144 S. Ct. 499 (2023)).

[2] A product design may be functional in two ways:  (i) functional de facto, meaning that the product has a particular function (for example, a bottle of any design holds a substance); and (ii) functional de jure, meaning that the product has a particular shape or configuration because it works better that way.  *See* *Great Neck Saw Mfrs., Inc. v. Star Asia U.S.A., LLC*, 727 F. Supp. 2d 1038, 1059 (W.D. Wash. 2010).  In contrast to designs that are functional de facto, designs that are functional de jure are not entitled to trade dress protection.  *Id.* (citing *Leatherman Tool Grp., Inc. v. Cooper Indus., Inc.*, 199 F.3d 1009, 1012 (9th Cir. 1999)).  Because the trade dress at issue is not on the PTO's Principal Register, plaintiffs bear "the burden of proving that the matter sought to be protected is not functional."  15 U.S.C. § 1125(a)(3).  Functionality is a question of fact.  *Fuddruckers, Inc. v. Doc's B.R. Others, Inc.*, 826 F.2d 837, 843 (9th Cir. 1987) (holding that the trial court erred in failing to instruct the jury about functionality).

[3] Trade dress attains "secondary meaning" when "the purchasing public associates the dress with a particular source."  *See, e.g.*, *Clicks Billiards Inc. v. Sixshooters, Inc.*, 251 F.3d 1252, 1262 (9th Cir. 2001).  A product feature whose only impact is "decorative and aesthetic, with no source-identifying role," is not protected by the Lanham Act.  *See id.*  Whether a particular trade dress has acquired secondary meaning is a question of fact.  *Id.*

ORDER - 2

a likelihood of confusion[4] between plaintiffs' and defendants' products exists; and

(iv) whether any of defendants' products infringe United States Patent No. 8,833,834

("the '834 Patent").

The Court's analysis necessarily begins with the operative pleading, *i.e.*, the Third

Amended Complaint ("TAC"), docket no. 144. In that document, plaintiffs MacNeil

Automotive Products, Limited, WeatherTech Direct, LLC, and MacNeil IP LLC

(collectively, "MacNeil Entities") alleged that their vehicle floor trays contain the

following nonfunctional features: (i) "a fore-and-aft oriented parallel array of ribs that

have a constant, predetermined width and a constant spacing apart from each other," with

the fore-and-aft ribs all being straight; (ii) "a recessed rectangular badge receptable

located near the aft, outboard corner of the floor tray," with the receptable being

"elongate" in a fore-and-aft direction; and (iii) "a specific surface texture on the upper

surface" of the floor tray. *See* TAC at ¶¶ 28–30 (docket no. 144). In response to an

interrogatory asking the MacNeil Entities to describe in detail the trade dress at issue,

they initially stated:

> The MacNeil Trade Dress generally comprises multiple channels and a group
> of ribs, the channels create the perception of multiple straight lines of varying
> length, each line parallel to each other, equal [sic] spaced apart and having a
> consistent width, the ribs create the perception of multiple lines that resemble
> a reverse facing "L" or an angled "V", other ribs create the perception of
> multiple lines that resemble an "L" or an angled "V", the straight lines are
> aligned with the lines formed by the ribs to create the perception that the lines

---

[4] Likelihood of confusion exists when "customers viewing the mark would probably assume that
the product or service it represents is associated with the source of a different product or service
identified by a similar mark." *Clicks Billiards*, 251 F.3d at 1265 (quoting *Fuddruckers*, 826 F.2d
at 845). Likelihood of confusion is a question of fact. *Id.* at 1264.

are continuous, the trade dress further comprising a rectangular area for a label with color located at the lower, outboard corner of the floor tray, parallel to the long axis of the floor tray.

Pls.' Resp. to Interrog. No. 1, Ex. 4 to Iqbal Decl. (docket no. 235-4 at 8).  The MacNeil

Entities later revised their answer to read:

The MacNeil Trade Dress comprises multiple channels positioned fore and a group of baffles/ribs* positioned aft, the channels create the perception of multiple straight lines of varying length, each line parallel to each other, equal [sic] spaced apart and having a consistent width, some of the baffles/ribs create the perception of multiple lines that resemble a reverse facing "L" or an angled "V", other baffles/ribs create the perception of multiple lines that resemble an "L" or an angled "V", the straight lines of the channels are aligned with the lines formed by the baffles/ribs to create the perception that the lines are continuous between the channels and the baffles/ribs.  The MacNeil Trade Dress further comprises a rectangular area for a label with offsetting color located at the lower, outboard half of the floor tray, parallel to the long axis of the floor tray.  The MacNeil Trade Dress further comprises a unique upper surface texture.

*For the avoidance of doubt, the terms baffle(s) and rib(s) are interchangeable and equivalent when referring to these structures/designs and they always have been.

Pls.' Supp. Resp. to Interrog. No. 1, Ex. 4 to Iqbal Decl. (docket no. 235-4 at 9).[5]

---

[5] In their improperly submitted separate evidentiary objections to materials plaintiffs filed in support of their motion for partial summary judgment, defendants asserted that plaintiffs' interrogatory responses were not properly "verified," were not executed by a person with personal knowledge, and should not be considered to the extent that the information "was provided by (or within the knowledge of) Ryan Granger," who did not appear for a scheduled deposition.  *See* Defs.' Evid. Obj. No. 4 (docket no. 274 at 3).  Defendants' objection is not only procedurally deficient, *see* Local Civil Rule 7(g) (prohibiting separate motions to strike except in a surreply), it is inconsistent with Federal Rule of Civil Procedure 33(b)(1)(B), which makes clear that an agent may answer interrogatories on behalf of a corporation.  *See United States v. 42 Jars, More or Less, of Bee Royale Capsules*, 264 F.2d 666, 670 (3d Cir. 1959) ("Under the amended rule the agent who answers on behalf of the corporation does not need to have personal knowledge.  The corporation's attorney will do."); *see also Shepherd v. Am. Broad. Cos.*, 62 F.3d 1469, 1482 (D.C. Cir. 1995); *Carramerica Realty Corp. v. NVIDIA Corp.*, No. C 05-428, 2010 WL 2629760, at *3 n.4 (N.D. Cal. June 29, 2010) ("It is well established that the signature of a corporation's attorney satisfies the verification requirement for interrogatory answers.").

ORDER - 4

In their motion for partial summary judgment, plaintiffs offered the following image of a representative driver-side floor liner for a particular vehicle:



Pls.' Mot. at 3 (docket no. 234 at 10).  Examples of the accused products marketed and/or manufactured by defendants Yita, LLC and Jinrong (SH) Automotive Accessory Development Co., Ltd. are as follows:




Pls.' Supp. Resp. to Interrog. No. 6, Ex. 4 to Iqbal Decl. (docket no. 235-4 at 30).

The MacNeil Entities have a portfolio of utility and design patents, some of which have expired.  *See* Exs. 4–6 to TAC (docket no. 144); Exs. 8–26 to LaPorte Decl. (docket no. 228); Exs. 1–2 to Schaum Decl. (docket no. 278).  The '834 Patent, which has been assigned to MacNeil IP LLC ("MacNeil IP"), discloses a "vehicle floor tray" that "is molded from a sheet of polymeric material of substantially uniform thickness."  '834 Patent at Abstract, Ex. 4 to TAC (docket no. 144-4 at 2).  Isometric and top views of a commercial embodiment of the claimed vehicle floor tray are shown below.



*Id.* at Figs. 1 & 2 (docket no. 144-4 at 5–6).  The '834 Patent contains fifteen (15) claims, three of which have been declared invalid (Claims 13–15).  *See Yita*, 69 F.4th at 1358.  Of the remaining twelve (12) claims, three are independent (Claims 1, 5, and 9) and the others are dependent.  Claim 1 is illustrative and reads:

> 1.  A system including a vehicle and a floor tray for consumer installation into a predetermined foot well of the vehicle, the system comprising:
>
> a vehicle foot well having a floor, a substantially longitudinally disposed first foot well wall upstanding from the floor, a substantially transversely disposed second foot well wall upstanding from the floor

and joined to the first foot well wall, a substantially longitudinally disposed third foot well wall upstanding from the floor and joined to the second foot well wall; and

a vehicle floor tray molded from a sheet of polymeric material of substantially uniform thickness, a central panel of the tray substantially conforming to the floor of the vehicle foot well, a substantially longitudinally disposed first tray wall joined to the central panel by a curved transition and standing up from the central panel to substantially conform to the first foot well wall, a substantially transversely disposed second tray wall joined to the central panel and to the first tray wall by respective curved transitions and standing up from the central panel, the second tray wall substantially conforming to the second foot well wall, a substantially longitudinally disposed third tray wall joined to the central panel and to the second tray wall by respective curved transitions and standing up from the central panel, the central panel and first, second and third tray walls each having an outer surface facing the vehicle foot well and an inner surface opposed to the outer surface, a thickness of the central panel and of the, [sic] first, second and third tray walls measured between the outer surface and the inner surface thereof being substantially uniform throughout the tray;

at least 90 percent of that one-third of the outer surfaces of the first, second and third tray walls which are closest to the respective top margins of the first, second or third tray walls being within one-eighth of an inch of the respective foot well walls.

'834 Patent at 20:4–40 (docket no. 144-4 at 26).

Plaintiffs contend that defendants have mimicked their trade dress in violation of both federal law (*i.e.*, the Lanham Act, 15 U.S.C. § 1125) and state law (Illinois common law and two Illinois statutes), and have infringed the '834 Patent. Plaintiffs seek partial summary judgment on the Lanham Act claim (Count III), and by extension the state law claims (Counts I, II, IV, and V), but not on their patent infringement claim (Count VII). *See* Pls.' Mot. at 10 & 32 n.4 (docket no. 234 at 17 & 39) (citing *Millennium Lab'ys, Inc. v. Ameritox, Ltd.*, 817 F.3d 1123, 1131 (9th Cir. 2016), which summarized *Cleary v.*

ORDER - 7

*News Corp.*, 30 F.3d 1255 (9th Cir. 1994), as clarifying that "trade dress claims under the Lanham Act and unfair competition claims under California Business and Professions Code section 17200 are inextricably linked").  Defendants request summary judgment on all claims relating to trade dress (Counts I–V), as well as on the claim premised on the '834 Patent (Count VII), but they have not briefed whether the elements of the state law claims are similar to the requirements of the Lanham Act.  *See* Defs.' Mot. at 66 (docket no. 225).  In response to plaintiffs' motion, however, defendants have suggested, without any explanation or supporting authority, that Illinois law differs from the Lanham Act, as well as from the California statute at issue in *Millennium Laboratories*, on which plaintiffs rely.  *See* Defs.' Resp. at 53 (docket no. 272 at 56).  Because the parties have not adequately addressed the state law issues, the Court declines to consider either side's motion relating to plaintiffs' claims for unfair competition under Illinois common law, unjust enrichment, violation of the Illinois Uniform Deceptive Trade Practices Act, and violation of the Illinois Consumer Fraud and Deceptive Business Practices Act.  Thus, regardless of the Court's rulings concerning the Lanham Act and patent infringement claims, plaintiffs' state law claims will remain for trial.

**Discussion**

**A.     Summary Judgment**

The Court may grant summary judgment only if no genuine dispute of material fact exists and the moving party is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(a).  The moving party bears the burden of demonstrating the absence of factual issues.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  A fact is material if it might

1    affect the outcome of the suit under the governing law.  *Anderson v. Liberty Lobby, Inc.*,

2    477 U.S. 242, 248 (1986).  In deciding a motion for summary judgment, the Court must

3    assume the truth of the opposing party's "affirmative evidence" and draw in its favor all

4    "justifiable inferences."  *Id.* at 255 & 257.  Applying these standards, the Court concludes

5    that neither side has made the requisite showing for summary judgment as to either of the

6    federal claims.

7    **B.    Lanham Act Claim for Trade Dress Infringement**

8         Plaintiffs contend that they have proven as a matter of law that the trade dress at

9    issue (1) is nonfunctional, (2) serves a source-identifying role because it has acquired

10   secondary meaning, and (3) is likely to be confused by consumers with defendants'

11   similar looking products.  *See Clicks Billiards*, 251 F.3d at 1258 (outlining the elements

12   of liability for trade dress infringement).  Defendants argue that plaintiffs have not and

13   cannot meet their burden of proof with respect to each of the three above-summarized

14   components of liability for their Lanham Act claim, and that plaintiffs cannot, as a matter

15   of law, establish lost profit damages.  The Court is not persuaded by either side.

16        **1.    Functionality**

17        The requirement of non-functionality in trade dress is premised on the existence of

18   "*a fundamental right to compete through imitation of a competitor's product*," which can

19   be only "*temporarily* denied by the patent or copyright laws."  *Leatherman Tool Grp.,*

20   *Inc. v. Cooper Indus., Inc.*, 199 F.3d 1009, 1011–12 (9th Cir. 1999) (emphasis in original,

21   quoting *In re Morton-Norwich Prods., Inc.*, 671 F.2d 1332, 1336 (C.C.P.A. 1982)).  In

22   evaluating whether trade dress is functional de jure, courts in the Ninth Circuit consider

23

1  the following factors, none of which are alone dispositive and all of which should be

2  weighed collectively:  (i) whether the design yields a utilitarian advantage; (ii) whether

3  advertising touts the utilitarian aspects of the design; (iii) whether alternative designs are

4  available; and (iv) whether the design is produced from a comparatively simple or

5  inexpensive manufacturing method.  *See* *Disc Golf Ass'n, Inc. v. Champion Discs, Inc.*,

6  158 F.3d 1002, 1006 (9th Cir. 1998).  The existence of an existing or expired utility

7  patent that claims the features of the trade dress at issue is "strong evidence" that such

8  features are functional, as opposed to "ornamental, incidental, or arbitrary" aspects of the

9  device.  *See* *TrafFix Devices, Inc. v. Mktg. Displays, Inc.*, 532 U.S. 23, 29–30 (2001).  On

10  the other hand, the existence of a design patent can help rebut functionality if combined

11  with other evidence of inherent distinctiveness.  *See* *Secalt S.A. v. Wuxi Shenxi Constr.*

12  *Mach. Co.*, 668 F.3d 677, 685 (9th Cir. 2012), *overruled on other grounds by* *SunEarth,*

13  *Inc. v. Sun Earth Solar Power Co.*, 839 F.3d 1179 (9th Cir. 2016).

14      In denying functionality, plaintiffs rely on their expired design patents, which

15  claimed the "ornamental design" for, respectively, "channels, treads and reservoir" or

16  "a tread pattern" for vehicle floor mats or trays, as shown below.



U.S. Patents Nos. D514,493 & D522,428,
Exs. 1 & 2 to Schaum Decl. (docket nos. 278-1 & 278-2).

1    In contrast, defendants quote from the specifications of several utility patents,

2    which explain that baffles and channels serve the purposes of (i) elevating the vehicle

3    occupant's foot or shoe above any fluid that might have collected in the reservoir of the

4    tray, and (ii) preventing accumulated fluid from "sloshing around." <u>See</u>, <u>e.g.</u>, U.S. Patent

5    No. 7,316,847 at 6:49–54, Ex. 8 to LaPorte Decl. (docket no. 228-2 at 58).  The design

6    and utility patents support the parties' respective arguments, but they are not dispositive.

7    The design patents are evidence that the patterns of baffles and channels were, at the

8    time, "new, original, and ornamental," <u>see</u> 35 U.S.C. § 171, but they do not establish that

9    the patterns were not also functional, <u>see</u> <u>Secalt</u>, 668 F.3d at 685.  The utility patents are

10   evidence that the baffles and channels serve a utilitarian purpose, but they do not prove

11   that the specific shapes (other than elongate with at least two ends remote from each

12   other) or spacing of baffles or the particular configuration of channels (other than a

13   plurality or at least one being molded or formed into the tray) are also functional.  <u>See</u>

14   Exs. 9, 11, 14–18, & 23 to LaPorte Decl. (docket nos. 228-2 & 228-3).

15    In further support of their assertion of functionality, defendants have offered an

16   advertisement in which plaintiffs[6] touted the utilitarian features of their vehicle floor

17

18   _____

19   [6] Defendants also rely on screen shots of websites in which third
     parties (<u>i.e.</u>, D&S Automotive Collision & Restyling in Ohio,

20   Leonard, and Crutchfield Corporation) discuss the advantages of
     plaintiffs' floor liners, <u>see</u> Ex. 36 to LaPorte Decl. (docket
     no. 228-3 at 494–507), but they do not explain how the contents

21   of these webpages can be imputed to plaintiffs, especially when
     the logo of one of plaintiffs' competitors (Husky) is also included,

22   <u>see</u> <u>id.</u> (docket no. 228-3 at 497) (reproduced to the right).



23

ORDER - 11

trays, but this evidence does not indicate that the particular pattern of baffles or channels

serves a purpose or is other than ornamental.  Thus, the marketing material is not itself

determinative.  Plaintiffs' puffery about their floor trays is reproduced below.



Ex. 36 to LaPorte Decl. (docket no. 228-3 at 490).[7]

---

[7] Defendants' expert Alan Ball, an industrial designer and inventor, has provided screen shots from a video entitled "WeatherTech Floor Liner: One Minute Overview," along with his written summary of the video.  *See* Ball Decl. at ¶¶ 16–19 (docket no. 227).  He indicates that the video is available at "www.weatheretach.com," *id.* at ¶ 16, but no such website exists or is associated with plaintiffs.  Although some of the screen shots and verbiage from the video extol the utilitarian benefits of the channels, *see id.* at ¶ 17 ("These unique channels carry messes away, trapping them in this reservoir . . . ."), they do not specify an exact pattern of baffles and channels or correlate functionality with the shapes, sizes, and/or spacing of the tray elements, *see id.* at ¶¶ 17–18.

With respect to the availability of alternative designs, the parties dispute whether competitors' products work as well as the trade dress at issue to isolate users' shoes away from any liquid and to minimize fluid movement while the vehicle is moving.  *See* Pls.' Mot. at 14–17 (docket no. 234 at 21–24) (reproducing images of other floor mats or liners); Defs.' Mot. at 23–25 (docket no. 225) (arguing that the other floor mats or liners do not contain "all claimed features in a different arrangement").  The parties also disagree concerning whether the floor tray design in question "achieves economies in manufacture or use" so as to establish a functional benefit.  *See Disc Golf*, 158 F.3d at 1009.  With respect to each side's motion, after taking the evidence in the light most favorable to the non-moving party and bearing in mind plaintiffs' burden of proof, the Court concludes that it cannot decide as a matter of law the fundamental underlying question, which is whether providing trade dress protection to plaintiffs would hinder competition, *see id.* at 1008, and the issue of functionality must be left to the trier of fact to decide.

2.    **Secondary Meaning**

Secondary meaning is "a mental recognition in buyers' and potential buyers' minds that products connected with the [trade dress] are associated with the same source." *Jason Scott Collection, Inc. v. Trendily Furniture, LLC*, 68 F.4th 1203, 1214 (9th Cir. 2023) (alteration in original).  Secondary meaning may be established through one or more of the following types of information:  (i) direct consumer testimony, (ii) survey evidence, (iii) exclusivity, as well as manner and length of use, of the trade dress, (iv) amount and manner of advertising, (v) amount of sales and number of

1    customers, (vi) established place in the market, and/or (vii) proof of intentional copying

2    by the defendant. *Id.*  Plaintiffs rely on their extensive advertising, commercial success,

3    and decades of exclusive, consistent use of their trade dress to assert that secondary

4    meaning has been achieved.  *See* Pls.' Mot. at 22–24 (docket no. 234 at 29–31).

5    Defendants counter that plaintiffs' advertising does not "educate" consumers to associate

6    the trade dress with a particular source, that plaintiffs have not provided any survey or

7    evidence of intentional copying, and that plaintiffs have permitted the trade dress to be

8    sold under "private labels" and licensed the trade dress to competitors.  *See* Defs.' Mot. at

9    26–30 (docket no. 225).  Plaintiffs respond that advertising need not explicitly tell

10   consumers about their trade dress.  *See Adidas-Salomon AG v. Target Corp.*, 228 F. Supp.

11   2d 1192, 1208 (D. Or. 2002) ("[T]he Coca-Cola Company does not say in its advertising

12   to 'look for the hourglass-shaped bottle,' and yet it is one of the most recognizable trade

13   dresses in the world.").  Plaintiffs further point out that survey evidence is not required,

14   and they explain that all "private label" products still bear plaintiffs' "WeatherTech"

15   branding.  *See* Pls.' Resp. at 28–30 (docket no. 275 at 35–37).  The Court is persuaded

16   that whether plaintiffs' trade dress has acquired the requisite secondary meaning is a

17   question of fact for the jury.

18         **3.     Likelihood of Confusion**

19         Whether a reasonably prudent consumer would be confused about the source of

20   goods having similar trade dress must be evaluated by considering the following non-

21   exhaustive list of factors:  (i) strength of the trade dress as a mark; (ii) proximity of the

22   goods; (iii) similarity of the products' trade dress; (iv) evidence of actual confusion;

23

1   (v) marketing channels used; (vi) type of goods and degree of care likely to be exercised

2   by the purchaser; (vii) the defendant's intent in selecting the trade dress; and (viii) the

3   likelihood of expansion of the product lines. *Jason Scott Collection*, 68 F.4th at 1218

4   (citing *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348–49 (9th Cir. 1979)).  The Ninth

5   Circuit has recognized that likelihood of confusion is "inherently factual" and "routinely

6   submitted for jury determination as a question of fact." *Clicks Billiards*, 251 F.3d at

7   1265.  The parties have offered competing evidence and arguments as to each of the

8   above factors, *see*, *e.g.*, Pls.' Mot. at 25–32 (docket no. 234 at 32–39); Defs.' Mot. at 31–

9   50 (docket no. 225),[8] and the Court is satisfied that, as usual, the likelihood of confusion

10  is factual.  As to plaintiffs' federal trade dress infringement claim, plaintiffs' motion for

11  partial summary judgment and defendants' motion for summary judgment are both

12  DENIED.

13      **4.**   **Damages**

14      Subject to certain limitations and the principles of equity, a plaintiff that has

15  proven a violation of the Lanham Act is entitled to recover (i) the defendant's profits,

16  (ii) the plaintiff's actual damages, including any lost profits, and (iii) the costs of the

17

18  ───────────────

19  [8] Defendants devote several pages of their motion and other briefs to criticizing the survey
    conducted by plaintiffs' expert Michael Kamins, Ph.D.  *See* Defs.' Mot. at 40–50 (docket

20  no. 225); Defs.' Resp. at 38–50 (docket no. 272 at 41–53); Defs.' Reply at 28–32 (docket no. 295
    at 30–34).  Defendants do not and cannot, however, suggest that a disregard of Kamins's survey

21  results would necessarily mean summary judgment must be granted in their favor.  Moreover, as
    plaintiffs aptly retort, for purposes of summary judgment, defendants' disparagements about

22  Kamins's methodology go to weight, not admissibility.  *See* Pls.' Resp. at 37 (docket no. 275 at
    44); *see also* *id.* at 36–41 (docket no. 275 at 43–48) (responding to defendants' objections).

23

action.  *See* 15 U.S.C. § 1117(a).  The Court may "enter judgment, according to the

circumstances of the case, for any sum above the amount found as actual damages, not

exceeding three times such amount."  *Id.*  The Court may also, "in its discretion," adjust

the amount of recovery based on a defendant's profits, if it is "either inadequate or

excessive" under the circumstances.  *Id.*  The award to a Lanham Act plaintiff "shall

constitute compensation and not a penalty."  *Id.*  In their motion for summary judgment,

defendants seek to strike plaintiffs' prayer for lost profits; they do not, however, contest

any other components of actual damages or plaintiffs' entitlement, if they prevail, to an

award of defendants' profits.  *See* Defs.' Mot. at 65–66 (docket no. 225).  Defendants

make three types of arguments concerning plaintiffs' alleged lost profits, which the Court

will address seriatim.

### a.    Ownership of Intellectual Property

As an initial matter, defendants assert that two of the three MacNeil Entities,

namely WeatherTech Direct, LLC ("WTDL") and MacNeil IP, have not been shown to

have any rights to the trade dress at issue, and that these two companies should therefore

be precluded from pursuing any lost profits.  *See id.*; *see also* Defs.' Resp. at 52–53 &

n.33 (docket no. 272 at 55–56).  Plaintiffs, however, have provided sufficient affirmative

evidence to raise a triable question of fact concerning which of the MacNeil Entities are

entitled to seek damages for trade dress infringement.

According to plaintiffs, on April 10, 2010, MacNeil Automotive Products, Limited

("MNAPL") assigned all its intellectual property, including the trade dress at issue, to

MacNeil IP.  Pls.' Supp. Resp. & 2d Supp. Resp. to Interrog. No. 13, Ex. 19 to Iqbal

1 Decl. (docket no. 242-2).  On April 13, 2010, David MacNeil executed an exclusive

2 intellectual property license on behalf of both MacNeil IP (as licensor) and MNAPL (as

3 licensee).  _See_ Ex. 20 to Iqbal Decl. (docket no. 242-3).  The April 2010 license granted

4 MNAPL an exclusive worldwide license to _inter alia_ the registered and unregistered

5 trade names, trademarks, and service marks identified on Exhibit B thereto.  _Id._ at ¶¶ 1.7

6 & 3.1.  The trade dress at issue was not explicitly mentioned in either the license or its

7 attached schedule of trademarks, but the design patents on which plaintiffs have relied to

8 contend that the trade dress is not functional (U.S. Patents Nos. D514,493 and D522,428)

9 appear on the patent schedule appended to the license.  _See id._ (docket no. 242-3 at 19).

10 On January 3, 2021, David MacNeil executed another exclusive intellectual property

11 license, this time on behalf of MacNeil IP (as licensor) and WTDL (as licensee).  _See_

12 Ex. 21 to Iqbal Decl. (docket no. 240-1).  The trade dress at issue is again not mentioned

13 in either the license or its attached schedule of trademarks, but the cited design patents

14 are referenced.  _See id._ (docket no. 240-1 at 15).  On March 24, 2025, David MacNeil

15 executed a document purporting to confirm, nunc pro tunc, (i) an assignment of the trade

16 dress at issue from MNAPL to MacNeil IP in April 2010, and (ii) MacNeil IP's licensing

17 of the trade dress in April 2010 and January 2021 to MNAPL and WTDL, respectively.

18 _See_ Ex. 6 to Iqbal Decl. (docket no. 236-1).

19         Defendants challenge the veracity of the March 2025 document and contend that

20 they should be permitted to depose David MacNeil.  _See_ Defs.' Resp. at 52 & n.32

21 (docket no. 272 at 55).  They provide no basis, however, for believing that David

22 MacNeil would, if deposed, contradict the writing, and they offer no explanation for why

23

1    they did not depose him or bring a motion to compel, if one was necessary, prior to the

2    applicable deadlines.  Defendants also attack the nunc pro tunc nature of the March 2025

3    document, citing _Gaia Technologies, Inc. v. Reconversion Technologies, Inc._, 93 F.3d

4    774 (Fed. Cir. 1996), in which the Federal Circuit held that, before commencing

5    litigation, parties must possess rights in the patents and trademarks on which they sue;

6    subsequent assignments generally cannot cure a defect in standing.  _See id._ at 779–80.

7          In the copyright context, the Ninth Circuit has recognized an exception to this rule,

8    and at least one district court has extended the exception to the realm of trademarks.  _See_

9    _Malovani v. Doe_, No. SACV 11-787, 2012 WL 12886493, at *4 (C.D. Cal. May 14,

10   2012) (citing _Jules Jordan Video, Inc. ("JJV") v. 144942 Canada Inc._, 617 F.3d 1146

11   (9th Cir. 2010)).  As explained in _Malovani_ and _JJV_, when a transferor and a transferee

12   of intellectual property rights are, respectively, a sole proprietorship and an individual (or

13   vice versa), the judicial concerns about retroactive assignments are not present.  2012 WL

14   12886493, at *4; _see_ 617 F.3d at 1156–57.  Because the business is controlled by the

15   individual, an assignment from one to the other can easily transpire without any "chain of

16   title" issues, the individual's wishes and intents are essentially co-extensive with those of

17   the company, and any fears about fraud, premature and/or duplicative lawsuits, and

18   vexatious litigation tactics are, in such circumstances, de minimis.  _See JJV_, 617 F.3d at

19   1156–57; _Malovani_, 2012 WL 12886493, at *4; _see also Gaia_, 93 F.3d at 780.

20         Plaintiffs represent that, before this action commenced, David MacNeil owned and

21   controlled MNAPL and MacNeil IP.  _See_ Pls.' Mot. at 10 (docket no. 234 at 17).  As a

22   result of a corporate reorganization in January 2021, WTDL now owns MNAPL, and

23

1  substantially all the assets and liabilities of MNAPL were transferred to WTDL.  *See id.*

2  at 11 (docket no. 234 at 18).  As MNAPL's successor, WTDL would be a proper party

3  with respect to whatever claims MNAPL had when this lawsuit began.  *See* 15 U.S.C.

4  § 1127 (indicating that "registrant" embraces the "legal representatives, predecessors,

5  successors and assigns" of such registrant); *see also* Fed. R. Civ. P. 25(c).  In light of

6  (i) David MacNeil's ownership of both MNAPL and MacNeil IP during the pre-litigation

7  period, (ii) the written assignments by MNAPL in favor of MacNeil IP in April 2010,

8  which were produced in discovery but not presented to the Court, *see* Pls.' 2d Supp.

9  Resp. to Interrog. No. 13, Ex. 19 to Iqbal Decl. (docket no. 242-2 at 10) (citing

10  M0082741–56 & M0082761–66), (iii) the April 2010 and January 2021 agreements that

11  could be construed as licensing the trade dress (along with the design patents) to MNAPL

12  and WTDL, respectively, and (iv) the March 2025 document, which purports to confirm

13  prior transactions, as opposed to newly assigning or licensing the trade dress, the Court

14  concludes that whether MacNeil IP and WTDL are appropriate plaintiffs constitutes an

15  issue for the trier of fact.

16  **b.    Separate or Aggregate Lost Profits**

17     Defendants contend that each of the MacNeil Entities must establish its own

18  separate lost profits.  *See* Defs.' Mot. at 65–66 (docket no. 225).  Plaintiffs respond that

19  calculations of lost profits for plaintiffs in the aggregate satisfy their evidentiary burden.

20  *See* Pls.' Resp. at 46 (docket no. 275 at 53) (citing *Mars, Inc. v. Coin Acceptors, Inc.*, 527

21  F.3d 1359 (Fed. Cir. 2008), *amended on other grounds*, 557 F.3d 1377 (Fed. Cir. 2009)).

22  *Mars* concerned damages for patent infringement, but the principles set forth in *Mars*

23

ORDER - 19

appear to apply in the trade dress context.  In _Mars_, the Federal Circuit observed that the

"correct measure of damages is a highly case-specific and fact-specific analysis," but the

availability of lost profits is a question of law reviewed de novo.  527 F.3d at 1365–66.

A patent holder is not entitled to recover under a lost profits theory based on an affiliated

corporation's lost sales unless the affiliated corporation's lost profits "inexorably" flow to

the patent holder.  _See id._ at 1365 & 1367 (citing _Poly-America, L.P. v. GSE Lining_

_Tech., Inc._, 383 F.3d 1303, 1311 (Fed. Cir. 2004)).

In _Poly-America_, the Federal Circuit explained:

> [Plaintiffs] Poly-America[, L.P.] and Poly-Flex[, Inc.] have a common parent
> corporation and are not simply divisions of a single corporation, but are
> separate corporate entities.  Their parent has arranged their corporate
> identities and functions to suit its own goals and purposes, but it must take
> the benefits with the burdens.  While we do not speculate concerning the
> benefits that the two companies reap from dividing their operations and
> separating the owner of the patent from the seller of the patented product,
> Poly-America and Poly-Flex may not enjoy the advantages of their separate
> corporate structure and, at the same time, avoid the consequential limitations
> of that structure—in this case, the inability of the patent holder to claim the
> lost profits of its non-exclusive licensee.  While Poly-America may have the
> right to sue under its patents, both as an owner and as a back-licensee, it can
> recover only its own lost profits, not Poly-Flex's.

383 F.3d at 1311.  In both _Poly-America_ and _Mars_, the licensees (Poly-Flex and Mars

Electronics International, Inc., respectively) experienced the lost profits at issue, but they

each lacked standing to recover because the licenses were non-exclusive.  _See id._ at

1311–12; 527 F.3d at 1367–68.  The same problem does not exist for plaintiffs in this

case because the alleged licenses are exclusive.  Thus, to the extent that MNAPL and

WTDL are licensees of MacNeil IP, they may pursue their own lost profits, and to the

extent that the trade dress (and/or '834 Patent) was not effectively assigned to MacNeil IP

1    and remains the intellectual property of MNAPL, only MNAPL may seek lost profits.[9]

2    Whether plaintiffs are limited to MNAPL's lost profits (presumably predating the 2021

3    corporate reorganization) is a question that must be left for a jury to decide.

4                        c.    **Online Sales**

5          Without citing any legal authority, defendants assert that plaintiffs' lost profits

6    must be limited to sales that would have been made via third-party online retailers, for

7    example, Amazon, Walmart, eBay, and/or Temu.  *See* Defs.' Mot. at 66 (docket no. 225).

8    Defendants further argue, again without jurisprudential support, that plaintiffs have not

9    provided any evidence that consumers would have purchased a vehicle floor tray from

10   plaintiffs if defendants' allegedly-infringing, less-expensive products had not been

11   available on the third-party online retailers' websites.  *Id.*  Plaintiffs respond that

12   questions of fact concerning market shares and online sales preclude summary judgment.

13   Pls.' Resp. at 46–47 (docket no. 275 at 53–54).  The Court agrees with plaintiffs that

14   defendants have not made the showing required for judgment as a matter in law in their

15   favor concerning plaintiffs' lost profits damages theory.

16

17

_____

18   [9] Plaintiffs make no claim that the lost profits of MNAPL and WTDL "inexorably" flowed to
19   MacNeil IP.  Indeed, neither of the licenses required royalty payments or linked MNAPL's or
     WTDL's fortunes to those of MacNeil IP.  *See* Exs. 20 & 21 to Iqbal Decl. (docket nos. 242-3 &
20   240-1); *see also Mars*, 527 F.3d at 1367 (explaining that "a traditional royalty-bearing license
     agreement" in which the licensee must pay royalties regardless of whether or not it makes any
21   profit does not demonstrate the "inexorably" flowing injury or "inherent" loss necessary for the
     licensor to recover lost profits).  MacNeil IP remains in the case because it has an interest in the
22   determination of whether it owns the intellectual property at issue, but to recover lost profits,
     MacNeil IP must prove that it, as opposed to MNAPL and/or WTDL, suffered such damages.

23

1    **C.**    <u>**Patent Infringement**</u>

2            Defendants seek summary judgment on grounds that the accused products do not

3    meet the conformance and uniformity requirements of the '834 Patent.  The conformance

4    standards relate to the amount of space, <u>*i.e.*</u>, less than or equal to one-eighth of one inch

5    (0.125"), that is between the outer surfaces of the tray walls and the vehicle's foot well

6    walls.  <u>*See*</u> '834 Patent at Claims 1, 5, & 9 (docket no. 144-4).  The independent claims of

7    the '834 Patent (Claims 1, 5, & 9) differ with regard to the percentages of the outer

8    surfaces of the tray walls that must satisfy the 0.125-inch tolerance, as reflected in the

9    following table:

10

11    | Claim | **Percentage of Tray Walls' Outer Surfaces**<br>that must be within 0.125" of vehicle's foot well walls |
      | --- | --- |
12    | 1 | at least 90% of the top one-third (⅓) |
13    | 5 | at least 90% of the top one-half (½) |
14    | 9 | at least 50% |

15

16    <u>*See id.*</u> at 20:36–40, 21:30–35, & 22:26–28.  The parties have offered contradicting

17    expert opinions concerning whether the accused products fit within the vehicle foot wells

18    as snugly as the '834 Patent requires.  <u>*Compare*</u> Granger Report at ¶¶ 82–87 &

19    Exs. 16–19, Ex. 2 to Schaum Decl. (docket no. 282-2) <u>*with*</u> Harris (Jensen Hughes)

20    Rebuttal Report [hereinafter "Harris Report"] at 13–32, Ex. 2 to Schaum Decl. (docket

21    no. 265-2).  Both sides criticize the opposing parties' expert's methodology, but neither

22    side has made a showing that the Court must, for purposes of summary judgment, strike

23

or disregard the measurements made by one or the other expert.[10]  Similarly, the parties

dispute whether defendants' vehicle floor trays are molded from a polymeric material of

"substantially uniform thickness," _see_ '834 Patent at 20:14–15, 21:8–9, & 22:4–5 (docket

no. 144-4), and they challenge the opinions of the other side's expert, but their arguments

go to weight, not admissibility.  As the moving party, defendants bear the burden of

establishing that the Court could decide, as a matter of law, the accused devices lack all

elements of the asserted patent claims, but they have not fulfilled this obligation, and

defendants' motion for summary judgment is therefore DENIED.

**Conclusion**

        For the foregoing reasons, the Court ORDERS:

        (1)    Plaintiffs' motion for partial summary judgment, docket no. 234, and

defendants' motion for summary judgment, docket no. 225, are DENIED.

        (2)    The parties are DIRECTED to submit briefs describing the elements of the

Illinois common law and statutory claims asserted by plaintiffs and indicating how they

---

[10] Although the parties suggest otherwise, their respective experts employed essentially the same methodology.  Each expert made holes in the accused vehicle floor mats, placed the mats in the foot wells of their associated vehicles, and inserted an instrument through the various holes to measure the amount of space between the walls of the mats and the walls of the foot wells.  _See_ Granger Report at ¶ 84 (docket no. 282-2); Harris Report at Figs. 12–14 (docket no. 265-2).  The primary difference between the experts' approaches was the choice of instrument; plaintiffs' expert opted for an imperial base 10 ruler (shown below, on the left), while defendants' expert pushed the depth gauge of a digital caliper through each of the holes (shown below, on the right).





Defs.' Reply at 36 (docket no. 295).    Harris Report at Fig. 14 (docket no. 265-2).

are similar to or different from the elements of a trade dress infringement claim under the Lanham Act.  Such briefs shall not exceed twelve (12) pages in length.  Each side's opening brief is due on August 22, 2025, and each side's response brief is due on September 2, 2025.  No replies shall be filed unless requested by the Court.

(3)    Nothing in this Order shall be construed as deciding any of the pending motions to exclude expert testimony, docket nos. 253, 254, 255, 256, 257, 260, 262, 264, and 266, which will be addressed in a separate ruling.

(4)    The Clerk is directed to send a copy of this Order to all counsel of record.

IT IS SO ORDERED.

Dated this 1st day of August, 2025.

Thomas S. Zilly
United States District Judge